LOUIS DEMAS SBN # 87286
Attorney at Law
2713 E Street
Sacramento, California 95816-3221
Telephone (916) 498-9055
Facsimile: (916) 848-3624
Email: Ldemas@demaslaw.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Susan Hood, Chester McNabb, Roland Haley, Connie Manselle, and Kenneth Barstow, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>City of Sacramento, Sacramento County,<br><br>Defendants. | Case No.:  2:23-cv-00232-KJM-CKD<br><br>SECONDAMENDED CLASS ACTION COMPLAINT Title II of Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973 (Class Action Allegation) |

1. Plaintiffs Susan Hood, Chester McNabb, Roland Haley, and Connie Manselle (collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, allege as follows:

INTRODUCTION

2. Plaintiffs bring this lawsuit against Defendant City of Sacramento ("Defendant "City") and Sacramento County ("Defendant County") to address their systemic failure to provide full and equal access to its sidewalks to Plaintiffs and similarly situated persons with mobility disabilities. For purposes of this Complaint, (Persons with mobility disabilities includes persons with ambulatory disabilities, visual disabilities, or any other disability for which the person

Class Action Disability Second Amended Complaint                    1

requires ADA compliant sidewalks, facilities, services, or programs to move throughout the Defendant City and Defendant County).  Defendant City, and Defendant County, has failed and continues to fail to maintain its sidewalks clear of debris and tent encampments, which is necessary to make its sidewalks readily accessible to people with mobility disabilities. A substantial number of the Defendant City's, and Defendant County's, sidewalks—particularly those in the busiest business and active travel corridors—do not comply with applicable federal statutes and regulations because they are blocked by tent encampments and attendant debris (often including toxic and used hypodermic needles), and unleashed animals rendering the sidewalks inaccessible, dangerous, and unsanitary for people with mobility disabilities.

3. The Defendant City's, and Defendant County's, sidewalks are a fundamental public program, service, or activity that the Defendant City, and Defendant County, provide for the benefit of its residents and visitors. Unimpeded and readily accessible sidewalks are necessary to permit people with mobility disabilities to participate in all aspects of society independently, fully, and meaningfully, including employment, housing, education, transportation, public accommodations, and recreation, among others. Accordingly, readily accessible sidewalks are essential to realizing the integration mandate of disability non-discrimination laws, including the Americans with Disabilities Act of 1990 (the "ADA"), the Rehabilitation Act of 1973 (the "Rehabilitation Act"), the Unruh Civil Rights Act (Civ. Code, § 51, et seq.) and Disabled Persons Act (Civ. Code, §§ 54-55.3).

4. Plaintiffs are individuals with mobility disabilities. Plaintiffs bring this action on behalf of themselves and all persons with mobility disabilities who live, work, or travel, within the City and County of Sacramento, and who are being denied full and equal access to the Defendant City's, and Defendant County's sidewalks, and are subjected to unlawful, dangerous, or

Class Action Disability Second Amended Complaint                2

hazardous conditions.

5. Federal disability access laws were enacted to provide persons with disabilities an equal opportunity to participate fully in civic life. *See* 42 U.S.C. § 12101(a)(7); 29 U.S.C. § 794(a) (Section 504 of the Rehabilitation Act ("Section 504")). Under the ADA and Section 504, a public entity's sidewalks, crosswalks, and paved paths—collectively referred to as a public entity's "sidewalks"—are a "service, program, or activity of the City and County within the meaning of Title II of the ADA." *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 959 (9th Cir. 2021). As detailed below, the Defendant City, and Defendant County, has excluded and continues to exclude Plaintiffs and all other similarly situated persons with mobility disabilities from participation in, and the benefits of, the City's and County's sidewalk program, service, or activity by failing to maintain the Defendant City's, and Defendant County's, sidewalks clear from tent encampments, dangers, and debris, thereby discriminating against persons with mobility disabilities.

6. The ADA and Section 504 mandate that a public entity operate each program, service, or activity so that the program, service, or activity, when viewed in its entirety, is readily accessible and usable by individuals with disabilities. 28 C.F.R. § 35.150(a), (b)(1); 45 C.F.R. § 84.22(a), (b). Where a person with a mobility disability "cannot traverse sidewalks [. . .] because of homeless encampments," a city can be required to clear the sidewalks "[t]o the extent the City is liable for the obstructions[.]" *LA Alliance*, 14 F.4th at 959.

7. The denial of meaningful, equal, and safe access to the Defendant City's, and Defendant County's, sidewalks for persons with mobility disabilities complained of in this Complaint is the direct result of the City's and County's policies, procedures, and practices regarding sidewalks and unsheltered persons. The Defendant City, and Defendant County, has failed to adopt or implement reasonable administrative methods, policies, and procedures for

Class Action Disability Second Amended Complaint                3

inspecting, clearing, and maintaining the sidewalks, as required by the ADA and the Rehabilitation Act.

8. Defendant City's, and Defendant County's, administrative methods, policies, and procedures, or lack thereof, discriminate against persons with disabilities by denying them access to the City's and County's sidewalks, as well as facilities in which the Defendant City's, and Defendant County's, programs, services, and activities are made available to the public. The Defendant City's, and Defendant County's, sidewalks, when viewed in their entirety, are not readily accessible to and usable by persons with mobility disabilities due to the City's and County's failure to maintain clear sidewalks free of debris, dangers, and tent encampments. The Defendant City's, and Defendant County's, most glaring violations are in some of the Defendant City's, and Defendant County's, busiest commercial and business corridors, and Defendant public transportation hubs, and pedestrian travel corridors. The Defendant City's, and Defendant County's, failure to maintain compliant sidewalks greatly diminishes the ability of persons with mobility disabilities to conduct business, commerce, travel, and engage in social activity throughout the Defendant City and Defendant County.

9. The Defendant City, and Defendant County, has failed to comply with the ADA and Section 504 by allowing tent encampments and debris to block Defendant City's, and Defendant County's, sidewalks for over three years. For over three years, the Defendant City, and Defendant County, has made compliance with the ADA and Section 504 a lower priority than other activities and projects, and expended funds, including discretionary activities and projects not mandated by law. The Defendant City's, and Defendant County's, failure to prioritize compliance with the ADA and Section 504 constitutes a policy or practice that denies program access to, and discriminates against, persons with mobility disabilities. This lawsuit seeks a court order requiring the Defendant City, and Defendant County, to comply with these laws to provide

Class Action Disability Second Amended Complaint                4

people with mobility disabilities full and complete access to the Defendant City's, and Defendant County's, sidewalks, as required by federal and state laws.

10. Plaintiffs bring this action to remedy violations of Title II of the ADA, 42 U.S.C. § 12101, *et seq.*, and its accompanying regulations, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, and its accompanying regulations, and Disabled Persons Act (Civ. Code, §§ 54-55.3).

11. Plaintiffs seek injunctive relief pursuant to these statutes and an award of reasonable attorney fees, expenses, and costs under applicable law.

## JURISDICTION AND VENUE

12. This is an action for injunctive relief brought pursuant to Title II of the ADA, 42 U.S.C. §§ 12101 to 12213, and Section 504, 29 U.S.C. § 794, *et seq.* to redress systemic civil rights violations against people with mobility disabilities by the Defendant City, and Defendant County.

13. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504.

14. This Court has jurisdiction to issue injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 65 of the Federal Rules of Civil Procedure.

15. Venue is proper in the Eastern District of California because the Defendant City, and Defendant County, resides in the Eastern District of California within the meaning of 28 U.S.C. § 1391, and because the events, acts, and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of California.

## PARTIES

16. Plaintiff Susan Hood lives in the Arden Arcade neighborhood of Sacramento County,

Class Action Disability Second Amended Complaint                    5

California and regularly travels throughout the Defendant County and Defendant City. Ms. Hood has a visual disability that limits her ability to walk and navigate without the assistance of her guide dog or a cane. Ms. Hood is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20)(B).

17. Plaintiff Chester McNabb ("Mr. McNabb") lives in Central City of Sacramento. Mr. McNabb has a mobility disability that substantially limits his ability to walk and requires the use of an electric scooter or a walker. Mr. McNabb is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20)(B).

18. Plaintiff Roland Haley ("Mr. Haley") lives in Central City of Sacramento and regularly travels throughout the Defendant County and Defendant City. Mr. Haley has visual and mobility disabilities that substantially limits his ability to walk and requires the use of an electric scooter or a walker, and a white cane. Mr. Haley is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20)(B).

19. Plaintiff Connie Manselle ("Ms. Manselle") lives in City of Sacramento in senior housing near Mack Rd and Valley Hi Drive and regularly travels throughout the Defendant County and Defendant City. Ms. Manselle has a mobility disability that substantially limits her ability to walk and requires the use of an electric scooter or a walker. Ms. Manselle is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and 29 U.S.C. § 705(20)(B).

Class Action Disability Second Amended Complaint                6

20. The Plaintiff class consists of all Sacramento residents with mobility disabilities who have used, use, or will continue to use, the sidewalks in the Defendant City, and Defendant County, through the date of judgment in this action.

21. At all times relevant to this Complaint, Defendant City, and Defendant County, is and has been a public entity within the meaning of Title II of the ADA and has received federal financial assistance within the meaning of the Rehabilitation Act of 1973 sufficient to invoke its coverage.

22. The Defendant City, and Defendant County, is a local government entity with the responsibility of providing Plaintiffs and other persons with mobility disabilities with access to its public facilities, programs, services, and activities. The Defendant City, and Defendant County, is responsible for maintaining, repairing, and regulating its sidewalks.

FACTS APPLICABLE TO ALL CLAIMS

23. In the past several years, the unsheltered population of Sacramento has increased substantially. Since the onset of the COVID-19 Global Pandemic and the corresponding economic downturn, the number of such persons camping on the streets of the Defendant City, and Defendant County, has exponentially exploded.

24. While political pressure has mounted on Defendant City, and Defendant County, officials to address these issues, the Defendant City, and Defendant County, has taken only limited action to maintain its sidewalks clear from tent encampments and debris and, instead, prioritizes other public projects. Defendant City and Defendant County has compounded the problem by encouraging proliferation of tent encampments. Defendant City adopted an ordinance, in effect ceding a portion of City sidewalks for continued maintenance of tent encampments, debris, garbage, and other dangers. Defendant City, and Defendant County, have taken official action to bar tent encampments in specific areas within their jurisdictions.

Class Action Disability Second Amended Complaint                7

25. Defendants City's, and Defendant County's, failure to curb and reasonably control the proliferation of tent encampments and accompanying debris has had, and continues to have, a particularly harmful impact on persons with mobility disabilities. Sacramento's mobility disabled population is frequently marginalized and relies on a functional governance to ensure their ability to effectively, and safely navigate, the Defendant City's, and Defendant County's, sidewalks, so that they may live their lives and meet their needs. The population of Sacramento County in 2020 was 1,585,055. The disabled population of the City of Sacramento is 11.8 per cent. The disabled population of the County of Sacramento is 12.4 per cent. The mobility disabled are more likely than others to rely on ADA compliant sidewalks to use the Defendant City's, and Defendant County's, public amenities.

26. A great number of tent encampments block the sidewalks and prevent persons with mobility disabilities from being able to use them. Additionally, the tent encampments typically contain attendant trash that pose additional health and safety threats.

27. The tent encampments in the two photographs, shown below, are tent encampments under the overpass of California Highway 99 at E Street. The first photograph is of the northern side of the street facing east and the second is on the southern side take facing east. Both show entire sidewalks being blocked from use by persons with mobility disabilities. Similar tent encampments have blocked and are blocking sidewalk access to persons with disability at California Highway 99 underpasses up to and including X Street. This E Street encampment was recently removed by the Defendant City prior to the filing of this complaint but the Defendant City has taken no steps to assure that a similar encampments will not return to the E Street underpass or for other tent encampments situated under California Highway 99. The California Highway 99 underpasses are major business, school, and social travel corridors including for students attending Sutter Middle School.

Class Action Disability Second Amended Complaint                    8





28. The tent encampment in this photograph, shown below, completely blocked Defendant County's sidewalk. This tent encampment at 2820 Fulton Ave is an obstacle to persons with

Class Action Disability Second Amended Complaint          9

mobility disabilities attempting to access business on a substantial business corridor.



29. The tent encampments shown in the above photographs are representative of numerous tent encampments throughout Defendant City, and Defendant County, that block access to sidewalks for persons with mobility disabilities.

30. Defendant City, and Defendant County, for its part, has failed to implement any consistent and reliable policy to clear and maintain the sidewalks such that all persons with mobility disabilities are able to use the sidewalks safely and effectively. Accordingly, the Defendant City, and Defendant County, has denied persons with disabilities readily accessible sidewalks.

## EXPERIENCES OF THE NAMED PLAINTIFFS

Susan Hood

Class Action Disability Second Amended Complaint                    10

31. Ms. Hood is a 64-year-old legally blind mobility disabled person. Before moving to Sacramento in 2017, Ms. Hood was a publicist in performing and visual arts, a freelance theater critic for Hartford Courant and for Hartford Advocate, and a freelance arts writer. When Ms. Hood lost her vision, she was in an independent degree program at Trinity college for adults returning to school. She was working on a Bachelor of Arts degree in Art History at Trinity College which ended once she became blind. Ms. Hood had a bioengineered mitral valve replacement. She was advised with the mitral valve replacement of the importance of being physically active and that walking is the best exercise.

32. Ms. Hood was paired with Geode, her guide dog by Guide Dogs for the Blind in late April 2019. Ms. Hood also uses a straight white cane for testing unknown terrain. Ms. Hood also uses the cane when going around obstacles on sidewalks such as cardboard and when gauging depth if required to step off a curb when tent encampments force her off a sidewalk. She also relies on her feet to sense obstacles. Geode and her guide dog work as a team with Geode changing postures for cues to Ms. Hood. Ms. Hood is not able to read street signs.

33. Ms. Hood lives in the Arden Arcade neighborhood of Sacramento, California. Ms. Hood frequently runs errands in her neighborhood and regularly travels to other parts of The City of Sacramento. Ms. Hood uses Defendant City's, and Defendant County's, sidewalks to do her errands and to access public transportation.

34. The tent encampments on the sidewalks have significantly diminished the ways she can move about her neighborhood, affecting her health and greatly elevating her fear for her safety. Ms. Hood repeatedly has, and continues to, alter her routes to maneuver around tent encampments in the Arden Arcade neighborhood and in the City of Sacramento. Ms. Hood has had to leave the sidewalks and travel in streets used by fast moving vehicles because the sidewalks were completely blocked by tent encampments. What was once were pleasurable

walks for Ms. Hood have become frightening and dangerous. Ms. Hood views the tent encampments as an unsafe condition and violation of the ADA that puts her and other people with mobility disabilities at risk of physical danger and harm, in addition to denying them equal access to public facilities.

35. Ms. Hood's ability to travel on partially blocked sidewalks is severely limited. She requires more space because she is walking side by side with her guide dog Geode and needs to avoid, and adjust to, slippery conditions, debris, and snarling and lunging dogs. Ms. Hood's difficulty in maneuvering obstructed sidewalks, when grocery shopping is compounded by her need to pull a utility cart behind her on the right, with Geode guiding at left.

36. Ms. Hood wanted a guide dog in part because people are often uncomfortable around a white cane or do not understand what a straight white cane signifies, which is blindness. In her experience with Geode, people are generally friendlier because they are curious about a guide dog who responds to physical and vocal commands. Ms. Hood feels she and Geode are a perfect match as handler and guide, and as a team they share a deep trust and emotional bond. She is greatly concerned that contaminated sidewalks, other debris, attacking dogs, and discarded hypodermic needles could severely injure, or kill Geode. This would be a great personal loss to Ms. Hood. Guide Dogs for the Blind has a long waiting list of approved applicants, so a minimum six month wait for an appropriate match is typical.

37. In November 2022 Ms. Hood's ability to use Defendant County's Arden Arcade sidewalk was severely compromised when Ms. Hood with her guide dog walked north on Fulton Avenue and came upon tent encampment in front of Ganas Auto (2820 Fulton Ave) blocking the entire sidewalk. Photograph of tent Fulton Avenue tent encampment blockage follows.



Below is a map and diagram of the difficult path that Ms. Hood was forced to take to get around



the tent encampment obstacle. Ms. Hood and her guide dog got off the bus at the Department of

Human Services and proceeded north on Fulton Ave on the eastern sidewalk at evening.  It was

Class Action Disability Second Amended Complaint                14

getting dark and vehicle traffic was heavy. With the heavy traffic, in this area people often drive into the parking lots and drive back out to get ahead of the traffic. She was very fearful of getting hit by a car–due to the tent encampment blocking her route. Ms. Hood was forced by the obstacles to maneuver around the parking lot and headed towards the McDonalds when she encountered another tent encampment. She and her dog couldn't proceed further with ADA walkways being obstructed by a tent encampment. Ms. Hood had to stop, turn right, go through the planter boxes in front of the McDonald's and then had to walk with her shoulder touching McDonalds' southern outside wall to gain access to ADA walkway that crosses the drive-through lanes. Ms. Hood then proceeded on the ADA pathway to the parking lot, turning left (North) along the sidewalk, across the walkway through the parking lot (east) and then left (north) along the Fabric Garden building to then go past Domino's Pizza and on along parallel to Marconi (east) to get to her home. If unfamiliar with the area, Ms. Hood wouldn't have been able to navigate the route. This was a frightful and harrowing journey for Ms. Hood, and she is thankful *she and Geode didn't get hit by a vehicle.*

38. During the month of September 2022, Ms. Hood made two trips to the central downtown Sacramento concentrated business area. One trip was for a visit to a business in Cesar Chavez Plaza. The other trip was to attend a performance at the Convention Center. The ticket was very expensive. Ms. Hood's travel to the destinations was exacerbated by the large scale concentrated homeless tent encampments on the sidewalks. Her fear of traveling on the widespread obstructed sidewalks, with debris, barking and snarling dogs, and discarded hypodermic needles was greatly exacerbated. The dangers included health and safety threats to her guide dog Geode. As a blind woman, when Ms. Hood's travel on sidewalks is impeded she may have to adjust her travel route. On these two trips her travel paths were blocked, causing her to reroute, backtrack and double check by asking a passerby where she is. This rerouting, and

backtracking, makes it extremely hard for her to gain her sense of direction, and she does not know if she is on the right street or headed in the right direction. As a result, Ms. Hood on these two trips was extremely frightened, filled with foreboding.

39. When Ms. Hood traveled to downtown Sacramento, she took Light Rail to the 12th and I Station. After leaving the Light Rail it takes her a bit of time to get her bearings to adjust to directional orientation.

40. On Ms. Hood's travel to the Sacramento Performing Arts Center, she got completely disoriented because she had to keep changing her route due to so many homeless tent encampments in the area that were completely blocking the sidewalk. Attempting to get to her destination within 2-3 blocks of the Light Rail station, she encountered tent encampments completely blocking the sidewalk, requiring her to backtrack to her last point of crossing and make a new decision on what way to travel. She became disoriented. If the sidewalks had not been obstructed by the homeless tent encampments, she should have arrived at the Performing Arts Center in no more than eight minutes. Because of the homeless tent encampments, it took her at least 20 minutes to arrive at her destination.

41. Ms. Hood's worst downtown travel experience was her travel to a business in the area of Cesar Chavez Park. Because of the obstructions from homeless tent encampments, Ms. Hood was compelled to keep crossing streets and repeatedly was again obstructed midway by homeless tent encampments. She was repeatedly forced to retrace her steps to get her bearings again. What should have been a few street crossings if the sidewalks were not obstructed resulted in multiple street crossings to get to her destination. She became extremely untethered causing her to lose her sense of direction which increasingly elevated worries for her safety and feeling of terror. A construction crew worker told her she could not continue on her new path. She soon realized the directions he gave her would put her right on the Light Rail tracks. Instead, Ms. Hood had to wait

until she heard someone walking near her to ask them for directions because she was totally lost, having no idea where she was. Being blind, when Ms. Hood's route gets confused, she needs to ask people for assistance, and her sense of direction gets muddled with multiple reroutes. These reroutes make it hard for her to re-acclimate to her surroundings, causing her to doubt if she's headed in the right direction or is on the right street. Ms. Hood's Hood travel to the business appointment was extremely agonizing because of the time required to complete her travel. If her travel had not been obstructed it should have taken her no more than fifteen minutes to complete this travel. Because of the homeless tent encampments, it took her at least thirty excruciating minutes to complete her travel.

42. Because of Ms. Hood's experience in traveling to the City of Sacramento, as described in the foregoing paragraphs 38-41, Ms. Hood was fearful of all travel to the City of Sacramento because of homeless tent encampments obstructions and from this fear was deterred from repeating such travel and will not do so again.

Chester McNabb

43. Chester McNabb is a 66-year-old resident of the City of Sacramento. Mr. McNabb was diagnosed with learning disabilities since birth. He can't read, write, or spell well. Mr. McNabb was enrolled in special education classes since 1st grade. His education ended during the eleventh grade. He is a mobility disabled person crippled by rheumatoid arthritis and osteoarthritis. Mr. McNabb worked until he was 28 when he suffered a major medical incident and has been barely able to walk since then. He has received government Supplemental Security Income (SSI) and Social Security Disability Insurance (SSDI) since he was 28.

44. McNabb was periodically homeless since 1986, often living in cars. He began living at Pioneer House on S Street in Sacramento in 2017.

45. Around 1996 he got his first wheelchair. Three months ago, he wrenched his back and

Class Action Disability Second Amended Complaint            17

now can barely move around his apartment. His ability to walk being extremely limited, he was, and is, totally dependent on his electric scooter to travel outside of his apartment on the sidewalks of the City and County of Sacramento and to use public transportation.

46. Mr. McNabb uses Light Rail to travel for medical appointments received from the University of California medical system. From Pioneer House he begins his Light Rail travel beginning at O and 8th Streets to get to the 48th Street Light Rail station. Mr. McNabb's travel to the Light Rail station is often impeded by tent encampments blocking sidewalks causing him to reroute his travel to go around the tent encampment obstructions. Mr. McNabb has been intimidated into changing his travel routes by persons within the sidewalk tent encampments acting violent or having mental episodes and by hostile and lunging dogs.

47. Mr. McNabb travels around his, and adjacent neighborhoods, on the sidewalks for personal errands. In his travel to the CVS drug store at 1701 K Street, on 18th Street he was unable to use the sidewalk because a person was sleeping across the sidewalk with the person's possessions across the area. Mr. McNabb had to turn completely around and go another direction. McNabb frequently needed to change his routes to get around tent encampments because of the sidewalks being blocked. McNabb now curtails his outside home travels because he feels endangered by the tent encampments, its users, its dogs, and debris. He no longer takes his dog to a dog park to relieve herself due to tent encampments and threats that he sees as being dangerous to his safety. This limits his sunlight exposure which exacerbates his Vitamin D deficiency.

48. Mr. McNabb's travels on sidewalks are impeded from broken glass, vomit, feces, and all kinds of other debris. His travel length and time is extended on the sidewalks so as to avoid tent encampment areas he regards as dangerous.

49. On January 24, 2023, Mr. McNabb travelled on Sacramento City streets to go the

Class Action Disability Second Amended Complaint          18

UCD Medical Eye Clinic 4860 Y Street to get an appointment to get his broken glasses fixed. He travelled on his electric scooter to the T Street underpass at 29th to 30th Streets. He was on the northern side of the street. Because of tent encampment obstructions, it took over six minutes for Mr. McNabb to travel one block. A video of the Mr. McNabb's travel on this one block is available at: https://photos.app.goo.gl/tLSGZRcB4pPJ5uGn6.



Class Action Disability Second Amended Complaint             19

50. The above video still picture shows Mr. McNabb entering the T Street underpass and having his travel blocked by tent encampments.



51 The above video still picture shows Mr. McNabb four minutes later waiting for a person in the tent encampment to clear a path for him.



52. The above video still picture shows Mr. McNabb advancing on the partially cleared sidewalk and being threatened by a large tent encampment dog.



53. The above video still picture shows Mr. McNabb, having passed a partially cleared tent encampment, seeing his travel blocked by another tent encampment.



54. The above video still picture shows Mr. McNabb being completely blocked from further travel on the sidewalk by another tent encampment.



55. The above video still picture shows Mr. McNabb, after exiting the sidewalk because of the tent encampments unmoved blockages, having to travel in the street in the path of oncoming vehicle.



56. The above video still picture shows Mr. McNabb continuing his travel in the street because of his not being able to renter the sidewalk because of the curb.



57. The above video still picture shows the northern part of the 30th street at T Street. 30th Street experiences heavy fast moving vehicle traffic. If McNabb chose to turn left, he would have again been forced into the street and subjected to fast moving vehicle traffic because of tent encampments on the eastern side of the street. The western side does not have a sidewalk.

58. Mr. McNabb lives alone with no close relatives to assist him. He is vulnerable from

the presence of tent encampments that inhibit his travels, and which put him in jeopardy. As are many of the mobility disabled persons, he is unable to defend himself from hostile dogs and persons using the tent encampments. His fears are worsened by being forced into the streets and possibly being hit by vehicles. Having his trips extended puts Mr. McNabb at risk of having his electric scooter charge exhausted leaving him stranded and unable to flee from danger.

Roland Haley

59. Roland Haley is a 56-year-old disabled man living in Midtown Sacramento. Mr. Haley is mobility disabled as a blind person and as one who relies on a power chair for travel outside his home.

60. Mr. Haley became disabled in 2010. Having diabetes, in 2008 his vision became very blurry and subsequently he was diagnosed with Retinal Neuropathy in 2008. Due to his diabetes he also has many health issues including autonomic and peripheral neuropathy. His organs are compromised, and he suffers from pain to extremities due to neuropathy.

61. In 2019 Mr. Haley's medical condition worsened. He was diagnosed with gastroparesis. Gastroparesis is a condition that affects the normal spontaneous movement of the muscles (motility) in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. With gastroparesis, the stomach's motility is slowed down or doesn't work at all, preventing the stomach from emptying properly. Gastroparesis is sometimes a complication of diabetes.

62. Mr. Haley's gastroparesis is so severe that he cannot eat normal food. All his nutrition is by liquid, through a feeding tube. During the beginning of his gastroparesis, he was bedridden and had to use a power wheelchair to get from his bed to the bathroom. Consequently, he was wasting away, losing 80 pounds. Mr. Haley physically now cannot walk a distance of more than 150 feet. He is currently performing physical therapy to rebuild his strength in hopes of

Class Action Disability Second Amended Complaint                    27

increasing his mobility.  Because he must return to his home to eat through IV fluids, if he is stranded outside his home, he could easily suffer a traumatic debilitating health episode.

63. Mr. Haley was born and raised in Sacramento up to age 12.  He has lived all over the United States and in Germany.  As an adult he worked at United Parcel Service in a supervisory role.  He lived in Tennessee for many years. While working at a Tennessee Lowes store, his vision deteriorated, and in 2010 he was declared legally blind.  He has a brother living in Sacramento who told him about the Sacramento Society for the Blind. Mr. Haley then moved back to Sacramento to get help from the Sacramento Society for the Blind.

64. Mr. Haley also chose to move back to Sacramento because it has a mostly flat terrain, has public transit, access to medical services, quality of life amenities, access to an airport, train service to the Bay area, and world class sports. Mr. Haley has four daughters living in Tennessee and would live there but for the features Sacramento has to offer. He considered Sacramento as an ideal spot for him to live in for accommodation of his disabilities.

65. Mr. Haley lives in a compact studio apartment. He was encouraged by his doctor to be as independent as possible even though disabled. His doctor also advised him to get out and about for his mental and physical health.  His family also encouraged him to get out of his studio apartment for his wellbeing. He also recognizes and appreciates the therapeutic benefit of experiencing the outdoors, feeling the sun, the wind, the rain, fresh air, changing seasons, etc.

66. With the rise of tent encampments with sidewalk travel obstructions in Sacramento, when Mr. Haley leaves his apartment, he is filled with fear and apprehension. He had little fear before the extreme increase in obstructive encampments in the area he now lives. As encampments increased his fear elevated in proportion to the increase of tent encampment and obstructions.  Now, when Mr. Haley comes off the elevator onto the wheelchair ramp to leave his apartment building, he pauses for a minute or two to get his nerve up to travel outside. When

Class Action Disability Second Amended Complaint                    28

outside, he must assess his travel situation constantly to ensure his safety. This constant need for vigilance when outside is a great stressor for him. Mr. Haley must assess whether he should leave the safety of his apartment to attend to his normal outside needs and affairs.

67. Mr. Haley has lived in the Sacramento City central grid area since 2010. Mr. Haley lives on a fixed income and makes some additional money through his home-based business reselling items on the internet. Although blind, he specializes in buying and repairing antique clocks. He often needs to take these items to the UPS and FedEx stores nearby for shipping. He cannot afford to use ride share services regularly. He must be able to travel the streets independently or use public transit to conduct his business as well as for his daily needs.

68. Mr. Haley is now completely reliant on his power wheelchair to get around Sacramento. Because he is blind, he must navigate on public streets using his white cane to determine where he is and if his route is passable by power wheelchair. He also uses public transit to get around Sacramento City and Sacramento County.

69. Mr. Haley has had blind friends attacked while at the Sacramento RT Light Rail stations. His blind mentor at Society for the Blind was hit from behind with a 2 x 4, knocking her completely unconscious. He has been truly in fear for his life when travelling in the City and County of Sacramento.

70. As a blind man in a power wheelchair, Mr. Haley must use his cane to figure out where he is, discern obstructions and hazards, and to assess whether he can travel safely. He does not know if there is a tent, or other obstruction, until he hits it with his cane. He accidentally ran into tents with his wheelchair and had apparent residents of the encampment yell at him and confront him for having hit tent encampments or associated materials.

71. Mr. Haley is a musician. Today he plays the cello, violin, and guitar and takes great pleasure in playing his musical instruments. Since August or September 2022, he has been unable

to travel to the Kline music store at Sutterville Road and 22nd Street, for repairs and parts for his musical instruments because sidewalks were being blocked by debris, people, and tent encampments. Mr. Haley started his trip to Kline's Music by taking the Sacramento RT Light Rail to the Sacramento City College Station and then by power motor wheelchair on sidewalks to Kline Music. His route has been blocked by homeless encampments, and with the diversions required, he had to travel on a dirt route to complete his trip to Kline Music. He was very frightened on this route and has not traveled this way again because of his fear. This is a hardship because he cannot readily get the parts for his instruments, or get his instruments repaired. With his disabilities, playing music brings him much joy and he is depressed being denied the joy of playing his musical instruments.

72. On or about, November or December 2022, Mr. Haley was travelling on the sidewalk with his daughter passing by the auto repair shop at 312 N 12th Street in Sacramento City. Both sides of the street had large encampments that were 20 feet long in width. He, and his daughter, had to completely reroute their travel for Mr. Haley to get around the blocked sidewalk areas.

73. On or about January 2023, Mr. Haley was travelling on Sacramento City sidewalks in the vicinity of the I street 7th Street light rail station. A large tent encampment forced Mr. Haley to exit the safety of the sidewalk and travel into the street. A big pickup truck pulled up next to him and the driver yelled at Mr. Haley something to the effect, "Hey idiot you are in the street on light rail tracks". Mr. Haley explained why he was forced onto the street. The driver then told Mr. Haley he would drive next to Mr. Haley as he travelled in the street as a protective escort to provide him with safety from other vehicles until he could again achieve sidewalk access.

74. In March 2023, Mr. Haley was traveling in the City of Sacramento eastbound on Q Street towards 19th Street. At the corner of 19th and Q Mr. Haley heard a man yelling at someone in the dog park. The man yelling was belligerent, yelling at a man he said was a Marine. Mr.

Class Action Disability Second Amended Complaint                    30

Haley was approaching the yelling man in his power wheelchair.  Mr. Haley was hoping to avoid the situation.  The belligerent man was walking away while yelling. As Mr. Haley got to the corner, the man came up behind his wheelchair, continuing to yell at the Marine, using Mr. Haley and his wheelchair as a shield.  Mr. Haley was very worried the man might attack him and kill him.

75. Mr. Haley's travel was obstructed, on or about, March 13, 2023, by a tent encampment at 10th and P Streets sprawling across the entire sidewalk.  When he goes out daily, he faces the possibility his route will be blocked, and since he is blind, he doesn't know his route is blocked until he gets to the blockage.  Once Mr. Haley gains access to a sidewalk and experiences an obstruction his forward progress is thwarted because he cannot access the street because sidewalks are not sloped, and any attempt could cause him to overturn in his power chair. This obstruction required him to reroute his travel path.

76. Mr. Haley must make sure he has enough battery life for his wheelchair for his safe return to his home.  When his route is severely impacted by encampments, people, or debris, he must take much longer routes. He then risks being stranded and not being able to return home to get necessary nutrition through his feeding tube.

77. On Tuesday, March 28, 2023, Mr. Haley was exiting the Sacramento RT Light Rail train at the 9th and K Street station.  He was going down the ADA ramp and ran into a rental e-scooter that was across the entire path.  He smashed into it with his shins, causing extreme pain. This happened again on March 30, 2023, at another RT ramp Mr. Haley was using.

78. Mr. Haley travels to medical appointments at the Kaiser downtown office at 5th and J Streets at least once a month and at times two to four times a month. His travels for these appointments on the sidewalks were regularly impeded and made dangerous by homeless tent encampments.

79. Mr. Haley often travels from his apartment to the Safeway Grocery store at 19th and Streets. His travel on the Sacramento City sidewalks have regularly been obstructed by the tent encampments. The Safeway grocery store is important for him because it provides service to blind shoppers by assigning a store employee to accompany and assist blind shoppers.

80. Mr. Haley, because of the tent encampment obstructions, has greatly curtailed how often he goes out for shopping and social activities. Nonetheless, he remains active and travels outside of the central city for his daily needs and mental health.  Mr. Haley travels, by public transportation and by power motor wheelchair on sidewalks, outside of the central City to Sacramento City and Sacramento County, to movie theater venues to experience films. He does so through The American Council of the Blind (ACB) and its Audio Description Project (ADP). ADP's aim is to bring more meaning and enjoyment to entertainment, cultural, and educational experiences for blind and visually impaired people. Audio Description as a voiceover narrative makes visual imagery accessible to people who are blind or visually impaired.

81. Mr. Haley travels, by public transportation and by power motor wheelchair on sidewalks, outside of the central City to Sacramento City and Sacramento County to visit his Niece who lives in the Consumnes River Community College area, to the Folsom Outlets, to the Arden Fair Mall, etc.

Connie Manselle

82. Connie Manselle is a 62-year old resident of the City of Sacramento.  Ms. Manselle is a mobility disabled person.  In 2013 she was diagnosed with Lupus, has severe muscular and joint pain due to arthritis and gout.  Ms. Manselle also has Post Traumatic Stress Disorder (PTSD). Prior to being disabled Ms. Manselle had a 33-year career in the gaming industry, being a card dealer, managing a casino, and acting as a pit boss and shift boss. She worked in Nevada, Mississippi, and California in casinos and worked aboard cruise ships. She moved to the

Sacramento area in 2011 and was attending MTI college in 2012 to become a paralegal when she was first diagnosed with Lupus. She received her Legal Secretary certification but had to stop paralegal courses when her Lupus first flared up. When her Lupus symptoms caused her to have cognition problems, she lost her financial grants and lost her rental assistance and had no income. In 2013 she became homeless, living first in her truck and then on the streets of Sacramento. She was in and out of shelters, finally getting counseling and HUD housing in 2016. She was also granted SSDI in 2016. In 2017 she found housing in the senior housing near Mack Rd and Valley Hi drive, where she now lives.

83. Ms. Manselle's PTSD was due to childhood abuse and from situations she found herself in while she was homeless. Her PTSD causes her severe anxiety. This anxiety is increased when she is traveling in her neighborhood using her power wheelchair.

84. On January 19 and 23, 2023 Ms. Manselle's travel on a Sacramento City sidewalk was obstructed by a tent encampment near the CVS drug store at 6401 Mack Road, Sacramento, CA. Close to the same area on the sidewalk, an apparent mentally impaired male used large rocks to block off sections around his grocery cart. On the same days, Ms. Manselle observed homeless individuals, who have been living at the bus stop for months, obstructing the sidewalks with their bikes and wagons 200 feet south of Shell gas station at 6490 Mack Rd, Sacramento, CA.

85. On January 27, 2023, Ms. Manselle's travel on the sidewalk was obstructed by broken glass, garbage, boxes left from tent encampment. These obstructions were strewn on the sidewalk and street next to CVS drug store at 6401 Mack Road, Sacramento, CA. A male individual in a sleeping bag and a grocery cart blocked the sidewalk at a nearby empty lot.

86. February 1 and 6, 2023. Ms. Manselle experienced the same obstructions to her sidewalk travel as described in the two foregoing paragraphs.

Class Action Disability Second Amended Complaint                33

87. On March 7, 2023, Ms. Manselle was traveling southbound on Valley Hi Drive from the Mack Road intersection.  During this trip to a store, she became entangled on a very large and heavy barbell that was placed on the Sacramento City sidewalk near the bus stop.  There was a large tent encampment at this location with several men living there. Ms. Manselle found herself unable to move in her chair because the barbell had gotten under her chair and lifted her chair at the power wheelchair battery compartment.  The barbell was also connected to a tarp that covered a shopping cart filled with more weights.  She could not free her chair from the barbell. Ms. Manselle yelled for help numerous times and became frightened and panicky. A man from the camp did eventually limp over to free her from the obstruction.  As Ms. Manselle was being extricated from the obstruction, the man who had placed the obstruction on the sidewalk yelled at her and argued with her. The harangue caused Ms. Manselle additional extreme anxiety and due to her PTSD she suffered insomnia, nightmares and depression for days afterwards.  Ms. Manselle does live completely independently, without local family, and, after this incident, to calm herself she had to telephone distant relatives for emotional support.

Below is an incident area map and picture of the obstruction.

Class Action Disability Second Amended Complaint                34



88. When Ms. Manselle is caught in an anxious situation, she feels sheer terror. She begins sweating, feels dizzy and faint. She feels truly helpless.

89. Ms. Manselle can only travel around in her power wheelchair. Her car is inoperable. She uses public transit to get to locations farther away. When Ms. Manselle takes the bus to other locations, she has also had repeated difficulty on the sidewalks due to encampments covering the entire sidewalk, forcing her into the street where there is fast-moving traffic.

90. Ms. Manselle is on a limited fixed income. Accordingly, to conserve her financial resources, she travels to areas within the Sacramento County jurisdictions to shop at stores with more beneficial economic benefit to her. Ms. Manselle's ability to travel to locations in Sacramento County (Gerber Road and Power Inn Road) has been severely impacted due to the presence of encampments along the route. In the last 9 months she has seen significant increases in the size and number of encampments she is encountering in Sacramento City and Sacramento County.

91. A map of Ms. Manselle's travel route from her home to the Gerber Road Power Inn Road area is set out below.

Class Action Disability Second Amended Complaint                35



92. The picture below shows a tent encampment obstruction on Ms. Manselle's shopping travel route at Gerber Road at the intersection of Palmer House Drive.



When Ms. Manselle comes upon an encampment that she cannot get around safely, she

Class Action Disability Second Amended Complaint              36

must travel greater distances to go to area local businesses. She has a 15-mile range on her power wheelchair and has had her battery run very low on several occasions. This is anxiety inducing exacerbated by her PTSD. She knows that because of her having a lower profile when travelling by her power wheelchair, it is more difficult for cars to see her. Accordingly, she avoids crossing streets whenever possible. Blocked sidewalks cause her to have to cross many more streets than she feels safe doing, and this increases her anxiety and fear.

## CLASS ACTION ALLEGATIONS

93. Plaintiffs bring this action individually, and on behalf of all Sacramento City and County residents with mobility disabilities who use or will use the sidewalks in the City of Sacramento and the County of Sacramento, as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

94. Each member of the class is a "qualified person with a disability" and a person with a "disability" pursuant to 42 U.S.C. § 12131(2) and 29 U.S.C. § 794(a). The persons in the class are so numerous that the joinder of all such persons is impracticable and that the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court. The class consists of thousands of people with mobility disabilities.

95. Defendant City, and Defendant County, has failed and continues to fail to comply with the ADA and Section 504 in its implementation of administrative methods, policies, procedures, and practices regarding the maintenance and regulation of city sidewalks to remain clear of tent encampments and debris that block and obstruct the sidewalks. Defendant City, and Defendant County, has not adopted and does not enforce appropriate administrative methods, policies, procedures, or practices to ensure compliance with the ADA and Section 504 and that persons with mobility disabilities have equal access to facilities, programs, services, and activities.

96. Defendant City, and Defendant County, has adopted administrative methods, policies,

Class Action Disability Second Amended Complaint                37

procedures, or practices to continue the maintenance of tent encampments on Defendant City, and Defendant County, sidewalks in violation of the ADA and Section 504 and that persons with mobility disabilities have equal access to facilities, programs, services, and activities.

97. The violations of the ADA have injured the Plaintiffs and every member of the class and give rise to actionable claims of discrimination under the ADA and Section 504 and, accordingly, Plaintiffs are entitled to injunctive relief requiring the Defendant City, and Defendant County, to forthwith remediate and maintain its sidewalks and walkways clear from tent encampments, debris, or other obstructions.

98. Defendant City, and Defendant County, has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the entire class.

99. The claims of the Plaintiffs are typical of those of the class in that they arise from the same course of conduct engaged in by Defendant City, and Defendant County. The relief sought herein will benefit all class members alike.

100. Plaintiffs will fairly and adequately represent the interests of the class. They have no interests adverse to the interests of other members of the class.

101. The requirements of Rule 23 of the Federal Rules of Civil Procedure are met regarding the proposed class, in that, the class is so numerous that it would be impractical to bring all class members before the court:

There are questions of law and fact which are common to the class;

Plaintiffs' claims for injunctive relief are typical of the claims of the class;

Plaintiffs will fairly and adequately represent common class interests; and

Defendant City, and Defendant County, has acted or refused to act on grounds generally applicable to the class.

102. The common questions of law and fact, shared by the Plaintiffs and all class members, include but are not limited to the following.

103. Whether Defendant City, and Defendant County, is violating Title II of the ADA, 42 U.S.C. § 12101, *et seq.*, by failing to remediate and maintain sidewalks free from obstructing tent encampments and debris which renders the Defendant City, and Defendant County, sidewalk program, service, or activity inaccessible to and unusable by persons with mobility disabilities, and which otherwise discriminates against persons with mobility disabilities.

104. Whether Defendant City, and Defendant County, is violating Title II of the ADA, 42 U.S.C. § 12101, *et seq.*, by failing to remediate and maintain sidewalks free from obstructing tent encampments and debris which renders facilities in which the Defendant City's, and Defendant County's, programs, services, or activities are made available to the public inaccessible to and unusable by persons with mobility disabilities, and which otherwise discriminates against persons with mobility disabilities.

105. Whether Defendant City, and Defendant County, is violating Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, by failing to remediate and maintain sidewalks free from obstructing tent encampments and debris which renders the Defendant City's, and Defendant County's, sidewalk program, service, or activity inaccessible to and unusable by persons with mobility disabilities, and which otherwise discriminates against persons with mobility disabilities.

106. Whether Defendant City, and Defendant County, is violating Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, by failing to remediate and maintain sidewalks free from obstructing tent encampments and debris which renders facilities in which the Defendant City's, and Defendant County's, programs, services, or activities are made available to the public inaccessible to and unusable by persons with mobility disabilities, and which otherwise

Class Action Disability Second Amended Complaint                 39

discriminates against persons with mobility disabilities; and Whether Defendant City, and Defendant County, by its actions and omissions alleged in this Complaint, has engaged in a pattern or practice of discriminating against Plaintiffs and other persons with mobility disabilities in violation of applicable federal disability access laws.

**FIRST CLAIM FOR RELIEF AGAINST CITY AND COUNTY UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990 42 U.S.C. § 12101 *ET SEQ.* AGAINST THE CITY AND COUNTY FOR PLAINTIFFS HOOD AND MANSELLE AND FOR THE CITY ONLY FOR PLAINTIFFS MC NABB AND HALEY.**

107. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

108. Title II of the ADA provides in part: "no qualified individual with a disability, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

109. At all times relevant to this action, the Defendant City, and Defendant County,  was and is a "public entity" within the meaning of Title II of the ADA and provides a sidewalk program, service, or activity to the general public.

110. At all times relevant to this action, Plaintiffs and the members of the class were and are qualified individuals within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of the services, programs, or activities of the City. 42 U.S.C. § 12131. 109.

111. Defendant City, and Defendant County, is mandated to operate each program, service or activity so that, "when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. § 35.149. This requirement

Class Action Disability Second Amended Complaint                    40

applies to all programs, services, and activities that a public entity offers, whether or not they are carried out in facilities that have been constructed or altered since January 26, 1992. Sidewalks are a vital public service or activity under Title II of the ADA. 28 C.F.R. § 35.104; *LA Alliance*, 14 F.4th at 959; *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002).

110.

112. The regulations implementing Title II of the ADA provide that a public entity must maintain the features of all facilities to be accessible by the ADA. 28 C.F.R. § 35.133. The facilities required to be accessible include sidewalks, walks, and passageways. 28 C.F.R. § 35.104. 111.

113. Due to the blockages and failures to remove the blockages addressed above, Defendant City's, and Defendant County's, sidewalks are not fully, equally, or meaningfully accessible to Plaintiffs and members of the class when viewed in their entirety. Nor are the facilities in which the City's programs, services, and activities made available to the public. Defendant City, and Defendant County, has therefore violated the "program access" obligation applicable to the unmaintained sidewalk facilities.

1114. Defendant City's, and Defendant County's, and its agents and employees have violated and continue to violate Title II of the ADA by failing to maintain the features of the City's sidewalks and walkways free of tent encampments, debris, and other obstructions, as is required to be accessible to ensure access to the Defendant City's, and Defendant County's, sidewalks.

115. As a direct and proximate result of the foregoing, Plaintiffs and members of the class have suffered and continue to suffer difficulty, hardship, anxiety, fear, and danger due to Defendant City's, and Defendant County's, failure to remediate and maintain sidewalks and walkways clear of tent encampments and debris throughout Defendant City's, and Defendant

Class Action Disability Second Amended Complaint                41

County's, sidewalks. These failures have denied and continue to deny Plaintiffs and members of the class the full, equal, and meaningful access to the sidewalks that the ADA requires.

116. Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiffs and members of the class are entitled to injunctive relief enjoining Defendant City, and Defendant County, to remediate, clear, and maintain all Defendant City's, and Defendant County's, sidewalks from debris and tent encampments such that, when viewed in their entirety, the Defendant City's, and Defendant County's, sidewalks are readily accessible and usable by individuals with mobility disabilities in a safe and clean manner; comply with Defendant City's, and Defendant County's, duty to maintain clear sidewalks free from debris and tent encampments; to ensure that all Defendant City's, and Defendant County's, sidewalks prospectively comply with all relevant ADA and Rehabilitation Act standards, as well as any other federal and state disability standards, regulations, or rules, whichever is most stringent in its disability access requirements and to fully comply with applicable law, and clear and maintain the City's sidewalks. Plaintiffs are also entitled to reasonable attorneys' fees, expert expenses, and costs incurred in bringing this action.

**SECOND CLAIM FOR RELIEF UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973 29 U.S.C. § 794 *ET SEQ*. AGAINST THE CITY AND COUNTY FOR PLAINTIFFS HOOD AND MANSELLE AND FOR THE CITY ONLY FOR PLAINTIFFS MC NABB AND HALEY.**

117. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

118. Section 504 of the Rehabilitation Act of 1973 provides in part: "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . .." 29 U.S.C. § 794(a).

119. Plaintiffs and members of the class are otherwise qualified to participate in the services, programs, or activities that are provided to individuals in the Defendant City, and Defendant County. *See* 29 U.S.C. § 794(b).

120. Defendant City, and Defendant County, is a direct recipient of federal financial assistance sufficient to invoke the coverage of Section 504 and has always received such federal financial assistance relevant to the claims asserted in this Complaint.

121. Defendant City, and Defendant County, and its agents and employees have violated, and continue to violate, the Rehabilitation Act and the regulations promulgated thereunder by excluding the class members from participation in, and denying the class members the benefits and services of Defendant City's, and Defendant County's, sidewalks for the reasons set forth above. These violations discriminate against the class members based solely by reason of their disabilities.

122. As a direct and proximate result of the foregoing, Plaintiffs and members of the class suffered and continue to suffer discrimination, difficulty, hardship, anxiety, fear, and danger due to Defendant City's, and Defendant County's, failure to remediate and maintain its sidewalks clear from tent encampments and debris. These failures have denied Plaintiffs and members of the class the full, equal, and meaningful access to the sidewalks that Section 504 requires.

123. Because Defendant City's, and Defendant County's, discriminatory conduct presents a real and immediate threat of current and continuing violations, injunctive relief is an appropriate remedy.

124. Pursuant to 29 U.S.C. § 794(a), Plaintiffs and members of the class are entitled to injunctive relief enjoining Defendant City, and Defendant County, to remediate, clear, and maintain all the Defendant City's, and Defendant County's, sidewalks from debris and tent

Class Action Disability Second Amended Complaint            43

encampments such that, when viewed in their entirety, the City's sidewalks are readily accessible and usable by individuals with mobility disabilities in a safe and clean manner; to comply with Defendant City's, and Defendant County's, Defendant City's, and Defendant County's, duty to maintain clear sidewalks free from debris and tent encampments; to ensure that all the Defendant City's, and Defendant County's, sidewalks prospectively comply with all relevant ADA and Rehabilitation Act standards, as well as any other federal and state disability standards, regulations, or rules, whichever is most stringent in its disability access requirements.

125. Plaintiffs are also entitled to reasonable attorneys' fees and costs incurred in bringing this action.

WHEREFORE, Plaintiffs request judgment as follows:

Certification of Plaintiffs' claims as a Class Action, certification of Plaintiffs as Class Representatives, and certification of Plaintiffs' counsel as Class Counsel.

Issuance of a permanent injunction requiring the Defendant City, and Defendant County, to forthwith undertake remedial measures to mitigate the effects of the Defendant City's, and Defendant County's, ongoing violations of Title II of the ADA, Section 504 of the Rehabilitation Act, and the regulations promulgated under those statutes.

At a minimum, the Defendant City's, and Defendant County's, be enjoined to take the following actions:

1. Maintain, and clear all Defendant City's, and Defendant County's, sidewalks from debris and tent encampments to shield class members from threats to their personal safety which they regularly experience when navigating close to tent encampments) such that, when viewed in their entirety, the Defendant City's, and Defendant County's, sidewalks are readily accessible and useable by individuals with mobility

Class Action Disability Second Amended Complaint                    44

disabilities in a safe and clean manner.

2. Prompt remedial measures of violations of the Defendant City's, and Defendant County's, duty to maintain clear sidewalks free from debris and tent encampments.

3. Prospectively comply with all relevant ADA and Rehabilitation Act standards, as well as any other federal and state disability standards, regulations, or rules, whichever is most stringent in its disability access requirements.

4. Statutory damages as provided by California law.

5. Reasonable attorneys' fees, expert expenses, and costs, as provided by law.

6. Such other relief as the Court finds just and proper.

DATED: October 23, 2023

s/s Louis Demas
LOUIS DEMAS
Attorney for Plaintiffs